AO 91 (Rev. 08/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
District of Maryland

| | |
|---|---|
| United States of America<br>v.<br>Rodney Ellis,<br><br>*Defendant(s)* | )<br>)<br>)  Case No.  13-714 BPG<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ April 8, 2013 _____ in the county of _____ Baltimore City _____ in the _____ District of _____ Maryland _____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. section 846 | Conspiracy to possess with intent to distribute five kilograms or more of cocaine |
| 18 U.S.C. section 924(o) | Conspiracy to possess a firearm in furtherance of a drug-trafficking crime |

This criminal complaint is based on these facts:
See attached Affidavit.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

James Bradley, Task Force Officer
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 04/09/2013

_____
*Judge's signature*

City and state: Baltimore, Maryland

United States Magistrate Judge Beth P. Gesner
*Printed name and title*

## AFFIDAVIT OF TASK FORCE OFFICER JAMES BRADLEY

Your affiant, Task Force Officer James Bradley, being duly sworn, does depose and state the following:

1. I am a Detective with the Baltimore Police Department and have been so employed since 1999. I have been deputized as a Task Force Officer with the DEA for approximately two years. I am currently assigned to the DEA's Special Investigations Group (DEA SIG), which investigates large-scale narcotics trafficking organizations in the Baltimore area. During my time as a law enforcement officer, I have participated in numerous investigations of unlawful drug distribution involving the use of confidential informants, undercover transactions, physical and electronic surveillance, telephone toll analysis, investigative interviews, the execution of search warrants, and the recovery of substantial quantities of narcotics, narcotics proceeds, and narcotics paraphernalia. I have reviewed taped conversations, as well as documents and other records relating to narcotics trafficking and money laundering. I have examined records consisting in part of buyers and seller's lists, and pay/owe ledgers. I have interviewed drug dealers, users and confidential informants and have discussed with them the lifestyles, appearance and habits of drug dealers and users.

2. Through training, education and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, the possession and use of firearms in connection with trafficking of such drugs, and the methods by which narcotics traffickers collect, store and conceal the proceeds of their illegal activities. I have also become familiar with the manner in which narcotics traffickers use telephones, cellular telephone technology, pagers, coded communications or slang-filled telephone conversations, false or

1

fictitious identities, and other means to facilitate their illegal activities and thwart law enforcement investigations.

3. This Affidavit is made for the limited purpose of establishing probable cause in support of Criminal Complaints alleging that GREYLING CHASE and RODNEY ELLIS (the "Target Subjects"), each: (a) conspired to possess with the intent to distribute 5 kilograms or more of cocaine, in violation of 21 U.S.C. § 846; and (b) conspired to possess firearms in furtherance of their drug conspiracy, in violation of 18 U.S.C.§ 924 (o). Because this Affidavit is offered for the limited purpose of establishing probable cause to support the Criminal Complaints, it contains only a summary of relevant facts. I have not included each and every fact known to me concerning the entities, individuals, and the events described in this Affidavit.

4. The statements made in this Affidavit are based in part on: (a) my personal participation in this investigation; (b) information provided to me by other law enforcement officers; (c) information provided to me and other law enforcement officers by confidential sources of information; (d) review of consensually monitored and/or recorded conversations; (e) criminal history records maintained by various law enforcement agencies, the Baltimore Police Department ("BPD") and the National Criminal Information Center ("NCIC"); and (f) the training and experience of myself and other law enforcement agents and officers.

5. To the extent that consensually recorded communications are summarized below, those summaries do not include references to all of the topics covered during the course of the conversation that was recorded. In addition, the summaries do not include references to all statements made by the speakers on the topics that are described. All quotations from recorded conversations are based upon preliminary transcriptions of those conversations and/or from your Affiant having personally listened to the recordings. In addition, the participants in many of

these communications involved the use of slang terms and code words. Those code words and slang terms, as well as communications in general, are analyzed to their meaning in this Affidavit based upon information from (a) confidential sources of information, (b) my training, experience and knowledge of this investigation, (c) other law enforcement officers' training, experience and knowledge of this investigation, and (d) other evidence gathered during the course of the investigation, such as physical surveillance.

6. Part of the information contained in this affidavit is based on information provided by a confidential source of information, hereinafter CS-6. CS-6 has been providing information to law enforcement for at least one year, and has made controlled purchases of narcotics, which has led to the seizure of drugs, money, and firearms. CS-6 is being paid for his/her cooperation and for consideration in pending criminal charges. CS-6's information has been corroborated to the extent possible and has been determined to be accurate and reliable. CS-6 has prior convictions for drug trafficking and for attempted murder.

7. In July 2012 the Special Investigation Group ('SIG") of the Baltimore Field Office of the DEA began an investigation of the activities of the "Black Guerilla Family" ("BGF"), a violent, historically prison-based gang active in correctional institutions and neighborhoods throughout Maryland. Based on evidence gathered to date, investigators believe that BGF members are currently engaged in, among other things, drug trafficking, robbery, extortion, money laundering and acts of violence.

8. CS-6 reported that he has known CHASE and ELLIS for several years and that both are high-ranking and long-standing members of BGF.

9. On or about March 23, 2013, CS-6, by chance, met with Greyling CHASE in Baltimore City. During their conversation (which CS-6 related to investigators), CHASE told

3

CS-6 that he was "hungry" (that is, in need of money). Based on this, CS-6 proposed that he and CHASE rob a (notional) drug trafficker that CS-6 had worked with in the past. CHASE agreed to commit the robbery, provided CS-6 with his (CHASE's) cellular telephone number and told CS-6 to call him to discuss the plan in more detail.

10. On or about March 23, 2013, at the direction of law enforcement, CS-6 placed a controlled/recorded telephone call to CHASE. CS-6 told CHASE that the target drug trafficker would soon be in possession of 10 kilograms of narcotics and that if they robbed the drug trafficker, then he (CS-6) and CHASE could split the stolen narcotics evenly. CS-6 told CHASE, "So, we get all that, the only thing I can give you is five because the other five for me and the other three people that help, who help me." CHASE agreed, telling CS-6, "Ok, uh, I'm gonna holler at (inaudible) a little while, some little comrade. As soon as I holler at him, I'm gonna get back to you" (meaning CHASE was going to enlist another BGF member to help commit the robbery and would then contact CS-6).

11. On March 23, 2013, at the direction of law enforcement, CS-6 placed a recorded call to CHASE. During that telephone conversation CHASE told CS-6, "I got the third man. A good dude, you hear me?" (meaning, CHASE had found another BGF member to help commit the robbery). CHASE told CS-6, "I mean, when we suppose to get together and rap (talk) on that? Cause I don't like, I can't do it like this dog (talk about the robbery on the telephone). CS-6 told CHASE they could meet in a few days to which CHASE told CS-6, "I'm going to bring, I'm going to bring my man with me" (meaning he would bring his associate) and that he would "lay it out and all that shit" (meaning he would explain the operation).

12. On or about March 28, 2013, at the direction of law enforcement, CS-6 placed a recorded call to CHASE in which he (CS-6) and CHASE arranged to meet at a location in

4

Baltimore City to discuss the robbery. CS-6 told CHASE that he would need to bring his own vehicle to the robbery, to which CHASE agreed.

13. On or about March 29, 2013, at the direction of law enforcement, CS-6 met with CHASE at a location in Baltimore City. The meeting was surveilled by investigators and audio and video recorded.

14. During the meeting CS-6 again told CHASE that he knew of a (notional) large-scale drug trafficker who would be receiving a large quantity of narcotics in the near future. CS-6 explained that an associate of CS-6 would meet with the target and place an order for narcotics. CS-6 explained that he and CHASE could watch the meeting and then follow the target to the target's stash house (where a large quantity of narcotics would be found).

15. CS-6 asked CHASE if he had a "ratchet" (a gun); CHASE told CS-6 that he (CHASE) did and that his associate (who he would enlist to help commit the robbery) would have a gun as well. CS-6 again told CHASE that there would be approximately 10 kilograms of cocaine in the stash house which he and CHASE could split evenly. CHASE asked CS-6 if there would be money and drugs in the stash house; CS-6 responded that there would be both. CHASE then asked CS-6 if they were going to have to "burn the nigger" (meaning kill the supplier) to which CS-6 replied, "If we got too, we got too. Fuck it." CHASE responded, "Ok. So we gonna mask up." Later in the conversation, CHASE told CS-6, "The thing is this. Whether or not we gonna have to do (kill) this nigger. If we gonna have to do him, we gonna do him in the best way we can. You feel me?...I'll go somewhere and dig a hole." CS-6 informed CHASE, "I was going to say, just in case we do, have some rope or something. Just in case. You never know. You feel me?" CHASE advised CS-6, "I'll get the rope." CHASE continued, "But

5

you got to go somewhere and dig a hole. You know what I'm saying? And just go ahead and throw his ass in, stripping him down and throw his ass in there."

16.　On or about April 1, 2013, at the direction of law enforcement, CS-6 placed a recorded call to CHASE. During the call CS-6 explained to CHASE that the target drug trafficker would be resupplied with narcotics in the next few days. CHASE told CS-6 that he had enlisted another BGF member to assist in the robbery and suggested that CS-6, CHASE and CHASE's associate meet to discuss the robbery. CS-6 agreed and made arrangements to meet with CHASE and CHASE's associate in the near future.

17.　On or about April 5, 2013, at the direction of law enforcement, CS-6 called CHASE and arranged to meet at a location in Baltimore City. Later that day, CS-6 met with CHASE and Rodney ELLIS (who CHASE had enlisted to assist in the robbery). Investigators surveilled the meeting and the meeting itself was audio and video recorded.

18.　During the meeting, CS-6 told CHASE and ELLIS that the target drug trafficker was about to be resupplied with narcotics. CS-6 explained that the supplier had been making his rounds collecting the "ham" (money) from his customer so that he could purchase the narcotics. CS-6 told CHASE and ELLIS that the supplier would have 10 "bricks" (kilograms) of narcotics and that he (CS-6) would keep 5 kilograms and that ELLIS and CHASE would receive 5 kilograms. ELLIS asked if the kilograms were "caine" (cocaine) or the "smack" (heroin); CS-6 explained that they were going to steal 10 kilograms of cocaine.

19.　CS-6 told CHASE and ELLIS, "Hey, you already know how it is like me, like me and Uncle, like me and Greyling was saying, shit get ugly we already know what we got to do" (meaning, that the robbers might have to kill the target drug trafficker). ELLIS told CS-6, "I prefer it to be that way to be honest. But I mean if don't then that's what it is."

6

20. CHASE asked if the robbery would be that day. CS-6 explained that it would likely be in a few days. CS-6 told CHASE and ELLIS that as soon as the target received his resupply of narcotics, that CS-6's associate would meet with the target to purchase a quantity of narcotics. CS-6 explained that he ELLIS and CHASE would watch the meeting and then "we gonna follow him to find out where he got the shit (the stash house) at." ELLIS told CS-6, "Sound like a plan to me." CS-6 asked ELLIS if he had a "ratchet" (gun) and ELLIS told him/her, "Yeah." Later in the conversation, ELLIS asked, "So we gonna follow the nigger (the target) to the location and then get the drop on him once he at the spot (the stash house)?" CS-6 explained, "when he going up in there, we going up in there (into the stash house) behind him."

21. On April 7, 2013, at the direction of law enforcement, CS-6 placed a recorded call to CHASE. During that phone conversation CS-6 told CHASE that the robbery was going to happen soon and that s/he would contact him the next day (April 8, 2013) with more details. CHASE confirmed that he was ready.

22. On April 8, 2013, at approximately 6:49pm, at the direction of law enforcement, CS-6 placed a recorded call CHASE and directed him to meet at a location in Baltimore City. At approximately 7:05pm, Greyling CHASE and Rodney ELLIS were observed arriving at the agreed upon meeting location where they met with CS-6 and another confidential source (hereinafter CS-8) who was posing as an associate of CS-6.

23. During the meeting CS-6 told CHASE and ELLIS that another associate of CS-6 would meet the target at the Burger King located directly across the street from where CS-6, CS-8, CHASE and ELLIS were sitting. CS-6 told CHASE and ELLIS that they could watch his associate meet with the supplier and then they could follow the supplier to his stash house where the co-conspirators would steal the supplier's drugs and money.

7

24. At approximately 7:32pm, two undercover officers (posing as the target and CS-6's associate) met in the Burger King parking lot and engaged in what appeared to be a CDS related conversation. At approximately 7:35pm, one of the undercover officers left the parking lot and traveled northbound on Annapolis Road. Both CS-6 and CS-8 followed the undercover officer out of the area as instructed.

25. Moments later CS-6 placed a recorded call to CHASE and told him that he (CS-6) had followed the "supplier" to the stash house and that CHASE and ELLIS should come northbound on Annapolis Road to meet them. CHASE confirmed and at approximately 7:38pm, CHASE and ELLIS exited the parking lot and began driving northbound on Annapolis Road (per CS-6's) instructions. CHASE's vehicle was quickly stopped and CHASE and ELLIS were quickly removed from the vehicle and placed under arrest.

26. A search of CHASE revealed a latex glove, as well as a black work-type glove over the latex on his (CHASE) right hand. A search of the vehicle revealed a Ruger P-89 9mm handgun concealed in a white bag which was located in the floor board area of the vehicle, and a FN-9 .32 caliber handgun which was located in a black bag under the center arm rest, both weapons were accessible to both, CHASE and ELLIS.

27. The TARGET SUBJECTS were subsequently *Mirandized* and all acknowledged their rights. CHASE and ELLIS subsequently agreed to be interviewed. CHASE and ELLIS each independently admitted that they planned to participate in a robbery of 10 kilograms of cocaine and that they understood that firearms would be used to facilitate the robbery. CHASE and ELLIS also admitted independently that they both obtained firearms to use to facilitate the robbery.

8

28. Based on my training knowledge and experience, I know that cocaine on the streets of Baltimore is typically sold to retail customers in 1/10 of a gram increments and that 10 kilograms of cocaine (the amount the co-conspirators intended to steal from the notional stash house) is unquestionably a distribution quantity of narcotics. Based on the most recent intelligence available to your Affiant, I know that the wholesale price of a kilogram of cocaine in Baltimore City is currently $40,000 and so 10 kilograms of stolen cocaine would have a resale value of approximately $400,000. Given these facts, I believe that the Target Subjects intended to steal the 10 kilograms of cocaine in order to resell it in Baltimore City.

29. Your Affiant also knows, based on his training and experience that in Baltimore City, teams of drug traffickers often rob competing drug traffickers of their drugs in order to gain a ready supply of narcotics that can then be re-sold. Your Affiant also knows that these robberies are typically accomplished by force, usually with firearms and sometimes resulting in violent encounters that result in the death or serious injury of the occupants.

30. To the best of my knowledge and belief, all statements made in this affidavit are true and correct. Based on the evidence provided, your Affiant believes that the Target Subjects intended to use the firearm pursuant to the arrest of the TARGET SUBJECTS to rob a notional drug trafficker of 10 kilograms of cocaine and then re-sell the stolen cocaine to customers in Baltimore City. Accordingly, based on the foregoing facts, I believe probable cause exists to support the issuance of a Criminal Complaint charging GREYLING CHASE and RODNEY ELLIS with; (1) conspiring with each other to knowingly and intentionally possesses with intent to distribute five kilograms, or more, of cocaine, in violation of Title 21 U.S.C. Section 846; and (2) conspiring to possess a firearm in furtherance of a drug trafficking crime which may be

prosecuted in a court of the United States, that is, possession with intent to distribute 5 kilograms, or more, of cocaine, in violation of Title 18 U.S.C. 924(o).

James Bradley
Task Force Officer, DEA

Sworn to and subscribed before me this 9th day of April, 2013.

Honorable Beth P. Gesner
United States Magistrate Judge